THE CURRITUCK ASSOCIATES—RESIDENTIAL PARTNERSHIP, A NORTH CAROLINA GENERAL PARTNERSHIP, PLAINTIFF-APPELLEE v. RAY E. HOLLOWELL, JR., D/B/A SHALLOWBAG BAY DEVELOPMENT COMPANY, DEFENDANT-APPELLANT v. KITTY HAWK ENTERPRISES, INC., THIRD-PARTY DEFENDANT

SHALLOWBAG BAY DEVELOPMENT COMPANY, LLC, PLAINTIFF-APPELLANT v. THE CURRITUCK ASSOCIATES—RESIDENTIAL PARTNERSHIP, DEFENDANT-APPELLEE

No. COA03-1082
No. COA03-1085

(Filed 7 September 2004)

**1. Jurisdiction; Rules of Civil Procedure— motion to enforce settlement agreement—failure to cite rule of civil procedure—notice**

The trial court did not lack jurisdiction and authority to grant appellee's motion to enforce the parties' settlement agreement regarding the purchase of property even though appellee failed to cite a specific rule of civil procedure in the motion, because: (1) a motion that does not comply with N.C.G.S. § 1A-1, Rule 6 is not defective if the parties are aware of the grounds upon which the

movant is relying; (2) although it is of great benefit to the courts for counsel to name and number the rule pursuant to which the motion is made, the only requirement is that the grounds for the motion and the relief sought be consistent with the Rules of Civil Procedure; (3) a settlement agreement may be enforced by filing a new action or by filing a motion in the cause even if the parties and their settlement agreement are still before the trial court; and (4) appellants were notified of the impetus of the motion and the relief sought, and they were given a chance to respond.

2. **Compromise and Settlement— motion to enforce settlement agreement—meeting of minds—statute of frauds—doctrine of frustration of purpose**

The trial court did not err by granting appellee's motion to enforce the parties' settlement agreement regarding the purchase of property, because: (1) a valid offer was made and accepted in the correspondence between the parties, thus showing the parties reached a meeting of the minds; (2) the statute of frauds does not require all of the provisions of the contract to be set out in a single instrument and a memorandum is sufficient if the contract provisions can be determined from separate but related writings; (3) in the instant case, the correspondence identified the parties, the purchase price, and the property to be sold; (4) sufficient evidence existed to support the trial court's determination that appellants' counsel had the authority to bind his clients and appellants have not rebutted the presumption that their counsel acted on their behalf; and (5) assuming arguendo that a water shortage would destroy the value of the property included in the settlement agreement, appellants have not reasonably protected themselves by the terms of the settlement agreement, it was unconvincing to argue that appellants could not reasonably foresee a condition in 2002 that they had prepared for in 1996, and there was no implied condition to the contract that a changed condition would excuse performance in order for the doctrine of frustration to apply.

Judge HUNTER dissenting.

Appeal by plaintiff Shallowbag Bay Development Company, L.L.C. and defendant Ray E. Hollowell, Jr., d/b/a Shallowbag Bay Development Company, from order entered 22 May 2003 by Judge W. Russell Duke in Dare County Superior Court. Heard in the Court of Appeals 24 May 2004.

CURRITUCK ASSOCS.—RESIDENTIAL P'SHIP v. HOLLOWELL

[166 N.C. App. 17 (2004)]

*Poyner & Spruill, L.L.P., by J. Nicholas Ellis, Esq., for appellee.*

*Ragsdale Liggett P.L.L.C., by George R. Ragsdale and Walter L. Tippett, Jr., for appellants.*

TIMMONS-GOODSON, Judge.

In separate appeals, Shallowbag Bay Development Company, L.L.C. ("Shallowbag") and Ray E. Hollowell, Jr. ("Hollowell") (collectively, "appellants") appeal the trial court order dismissing their claims. Prior to argument, the appeals were consolidated pursuant to N.C.R. App. P. 40 (2004). After reviewing the merits of the consolidated appeal, we affirm the trial court's order.

The facts and procedural history pertinent to the instant appeal are as follows: In February 1996, The Currituck Associates-Residential Partnership ("appellee") and appellants entered into a contract whereby appellee would sell appellants a 9.2 acre parcel of property located in Currituck County ("the contract"). The parcel was located within The Currituck Club ("Currituck Club") a Planned Unit Development in Currituck County. Portions of Currituck Club had previously been developed by appellee. Appellants planned to name the parcel Windswept Ridge Villas ("Windswept Ridge") and construct ninety-six residential condominium units on it.

The contract contemplated a six-year "take down" of seven pieces of the property designated "pads" by the parties. On 20 March 1997, the parties closed the sale of the first pad. After two modifications of the contract, the parties closed the sale of the second pad on 12 January 1999. On 1 September 1999, the parties closed the purchase of the third pad. However, the parties failed to close the sale of the fourth pad, which was contemplated for Fall 2000.

On 30 April 2001, appellee notified Hollowell that appellants were in default under the contract. On 1 June 2001, appellee filed a Complaint against Hollowell and requested that the trial court declare that "Hollowell materially breached the [contract] and [appellee] is therefore discharged from further obligations thereunder or, in the alternative, for a declaration of the rights and duties of the parties under the [contract][.]" Hollowell filed an Answer and Counterclaim on 20 September 2001, claiming that appellee had breached the contract and requesting damages and specific performance of the terms of the contract. That same day, Shallowbag Bay filed a Complaint against appellee, alleging the

same breach and requesting the same remedies as Hollowell's Answer and Counterclaim.

Appellee initiated discovery in the litigation and the parties scheduled witness depositions for Summer and Fall 2002. On 28 August 2002, appellants' counsel extended a settlement offer to appellee, whereby appellants would close on the remaining pads by 15 January 2002 for an agreed upon price. In a letter dated 30 August 2002, appellee's counsel responded to the offer and accepted many of its terms. Appellee also proposed that it have an option to repurchase the third pad if appellants failed to close the purchase of pads four through six by 15 January 2003. On 30 August 2002, appellants' counsel sent appellee's counsel a letter accepting appellee's proposal. Appellants suggested that the only issue preventing the parties from settling their claims was the marketing of the condominiums after purchase.

On 3 September 2002, appellee's counsel confirmed via email that an agreement between the parties had been reached regarding appellants' marketing of Windswept Ridge. The email also stated that "in view of our settlement, please permit this email to confirm [that] the depositions scheduled for later this week will not take place." On 6 September 2002, appellee's counsel sent an email to appellants' counsel, attaching a "Mutual Release and Settlement Agreement" that outlined the parties' agreement.

On 2 October 2002, appellee's counsel solicited appellants' comments regarding the "Mutual Release and Settlement Agreement." Appellants' counsel responded that he "had hoped to have the draft purchase agreement in place for attachment" to his response, but that he would nevertheless "forward the settlement agreement to [appellee's counsel] [on 3 October 2002] with or without [the comments]." On 3 October 2002, appellants' counsel sent appellee's counsel an email describing his "changes to the initial draft of the settlement agreement." Attached to the email was a copy of the "redlined changes." The email stated that appellants' counsel "must reserve the right to supplement or change [his] comments after [Hollowell's] review." The email outlined the "revised document" and noted that appellant "would like to have a full blown purchase contract" replace a portion of the "Mutual Release and Settlement Agreement" that concerned the purchase of pads four through six. On 16 October 2002, appellee's counsel responded to appellants' email and outlined various "points to discuss" concerning the agreement.

At appellants' request, Quible and Associates, P.C. ("Quible") prepared data regarding Currituck Club's water system in November 2002. After reading Quible's report, appellants became concerned about the supply of potable water in Currituck Club. After appellants' counsel notified appellee's counsel about these concerns, the parties began communications regarding the execution of a storm water management easement and deed.

On 16 December 2002, appellee's counsel sent appellants' counsel an email inquiring whether the "deal [was] going to close by Jan. 15." Appellee's counsel indicated that he was "starting to have [] doubts that [appellants] [were] going to purchase Pads 4-6." On 23 December 2002, appellants' counsel sent appellee's counsel a "draft contract" outlining the terms of a "Purchase Agreement." Appellee's counsel responded with two emails on 23 December 2002. The first email included "comments on the Purchase Agreement." The second email contained the following statements:

> The parties have a settlement. [Appellants] cannot now come up with some "issues" to try to back out of the agreement.

> I hope we're not getting to this point, but I do want to make sure your client realizes that this agreement will be enforced.

The parties did not close the purchase of pads four through six by 15 January 2003. Instead, their counsel continued to negotiate terms of the storm water easement and deed. In Spring 2003, appellants became increasingly concerned about the adequacy of the potable water available to Currituck Club, as well as legal issues surrounding Currituck Club's water supplier. On 7 March 2003, appellee informed appellants that if they did not close the purchase of pads four through six by 21 March 2003, it would exercise its option to repurchase pad three.

The parties failed to close the purchase of pads four through six by 21 March 2003, and on 4 April 2003, appellee filed a Motion to Enforce Settlement Agreement in Dare County Superior Court. In an order filed 22 May 2003, the trial court concluded that the parties had reached an agreement in September 2002 that satisfied the requirements of the statute of frauds. The trial court then granted appellee's motion to enforce the settlement agreement, and it ordered that appellee be given sixty days to exercise its option to repurchase pad three. The trial court also dismissed appellants' claims

with prejudice and taxed attorneys' fees and costs against appellants. It is from this order that appellants appeal.

The issues on appeal are: (I) whether the trial court lacked jurisdiction and authority to entertain and grant appellee's Motion to Enforce Settlement Agreement; and (II) whether the trial court erred in granting appellee's Motion to Enforce Settlement Agreement.

[1] Appellants first argue that the trial court lacked jurisdiction and authority to consider appellee's Motion to Enforce Settlement Agreement. Appellants contend that because appellee failed to cite a specific rule of civil procedure in its Motion to Enforce Settlement Agreement, the trial court lacked jurisdiction and authority to enter the order. We disagree.

North Carolina's superior and district courts require that "[a]ll motions, written or oral, shall state the rule number or numbers under which the movant is proceeding." General Rules of Practice For the Superior and District Courts, Rule 6 (2003). However, N.C. Gen. Stat. § 1A-1, Rule 7(b)(1) (2003) requires only that motions to the trial court "state with particularity the grounds therefor, and . . . set forth the relief or order sought." Thus, since "[t]he directive of [Rule 6] has the salutory purpose of ensuring that the [trial] court and the parties are aware of the grounds upon which the movant is relying," a motion that does not comply with Rule 6 is not defective if the parties are given adequate notice. *Wood v. Wood*, 297 N.C. 1, 6, 252 S.E.2d 799, 802 (1979); *see Home Health and Hospice Care, Inc. v. Meyer*, 88 N.C. App. 257, 262, 362 S.E.2d 870, 872 (1987) (stating that "failure to give the number of the rule is not necessarily fatal" to a motion or claim). Therefore, although "it would be of great benefit to the trial court and this appellate court for counsel to name and number the rule pursuant to which the motion is made," *Id.*, this Court only requires that "the grounds for the motion and the relief sought . . . be consistent with the Rules of Civil Procedure." *Gallbronner v. Mason*, 101 N.C. App. 362, 366, 399 S.E.2d 139, 141, *disc. review denied*, 329 N.C. 268, 407 S.E.2d 835 (1991), *writ of mandamus dismissed*, 333 N.C. 167, 424 S.E.2d 909 (1992).

In the instant case, appellee's motion requested that the trial court enforce the settlement agreement and order the following:

(a) That the Contract between [appellee] and [appellants] is terminated and that [appellee] is under no obligation to sell Pads 4-6 to [appellants].

(b) That the Notice of Lis Pendens filed by [appellants] against [appellee's] property be canceled.

(c) That from the date the order enforcing the settlement agreement is filed with the Clerk of Court, that [appellee] have 60 days from that date in which to exercise an option to purchase Pad 3 of [Windswept Ridge] from [appellants] for $585,000. If such option is exercised, [appellee] would be required to close on the purchase of Pad 3 at [Windswept Ridge] from [appellant] within 60 days from the date that such option is exercised.

(d) That all claims for relief asserted by [appellant] against [appellee] be dismissed with prejudice and that [appellee], its owners, partners, managers, employees and agents be released from any and all such claims asserted by [appellants] in the two lawsuits.

(e) That the Court enforce any other terms of the settlement agreement it deems just and proper.

(f) That the Court tax attorneys' fees and costs against [appellant] that are associated with the enforcement of the parties' settlement agreement.

In *State ex rel. Howes v. Ormond Oil & Gas Co.*, 128 N.C. App. 130, 493 S.E.2d 793 (1997), the defendant appealed the trial court order requiring it to comply with the terms of a consent judgment that had been proposed by the State. After reviewing the record, we concluded that the defendant did not agree to the terms of the consent judgment, and that the consent judgment was not an "accurate memorialization of the parties' intent regarding their [prior] settlement agreement." *Id.* at 135, 493 S.E.2d at 796. Thus, we held that the trial court erred in incorporating the terms of the proposed consent judgment into its order, and we vacated the trial court order. *Id.* at 136, 493 S.E.2d at 796. Although the State had filed its motion in the same action the agreement purported to dismiss, we allowed the trial court to consider whether the State was entitled to specific performance of the settlement agreement on remand. *Id.* at 137, 493 S.E.2d at 797. Appellants contend that this instruction was dicta, and that this Court has not yet decided whether a party may file a motion in the cause to enforce a settlement agreement in lieu of dismissing the cause and filing a second claim for breach of contract. We disagree.

In support of our instructions in *Howes*, we stated:

> Although our courts have not laid down a precise method for the enforcement of [settlement agreements], the general rule in other jurisdictions is that a party may enforce a settlement agreement by filing a voluntary dismissal of its original claim and then instituting another action on the contract, or it may simply seek to enforce the settlement agreement "by petition or motion in the original action." . . . Here, the parties and their settlement agreement were still before the trial court when the State sought entry of the proposed consent judgment which, as the court's judgment makes clear, was actually a demand for specific performance of the parties' settlement agreement. By asking the court to enter judgment in accordance with what it believed were the terms of the parties' settlement agreement, the State evidenced its readiness to comply with the terms of that agreement and Ormond's refusal to do likewise. The trial court having concluded that the State was entitled to have the parties' settlement agreement enforced, we hold that the trial court may enter a judgment in this case in accordance with the terms found in the parties' settlement agreement.

128 N.C. App. at 136-37, 493 S.E.2d at 796-97 (citation omitted). Thus, we are bound by our previous determination that a settlement agreement may be enforced by filing a new action or by filing a motion in the cause, even if "the parties and their settlement agreement [are] still before the trial court." *Id.* at 137, 493 S.E.2d at 797.

In the instant case, appellee's motion was in writing and filed during the original action. It described the contract between the parties and the negotiations between the parties that led to the alleged agreement. Attached to the motion were approximately fifty pages of correspondence between the parties. The motion clearly sought to enforce the settlement agreement pursuant to case law, and to dismiss appellants' claims pursuant to N.C. Gen. Stat. § 1A-1, Rule 41 (2003). Thus, appellants were notified of the impetus of the motion and the relief sought, and they were given a chance to respond. Therefore, we conclude that appellee's motion satisfied the mandates requiring particularity in pleadings. Accordingly, we hold that the trial court had jurisdiction over appellee's motion, and that its order granting the motion did not deprive appellants of their due process rights.

[2] Appellants next argue that the trial court erred in granting appellee's Motion to Enforce Settlement Agreement. Appellants assert that the correspondence between their counsel and appellee's counsel only established an "agreement to agree" between the parties, not an enforceable settlement agreement. We disagree.

In the instant case, on 28 August 2002, appellants' counsel sent appellee's counsel a letter regarding the then-pending litigation. That letter reads, in pertinent part:

> Pursuant to our recent discussions, I have revisited settlement options with [appellants]. [Appellants] [are] now willing to settle through termination of the current contract (and its modifications) and the execution of a new agreement stipulating that on or before January 15, 2003, the parties will perform as complete the following:
>
> . . . .
>
> > (2) [Appellants] will close on the purchase of the three remaining pads . . . at a cost of $472,500 each for a total of $1,417,500.
>
> . . . .
>
> I believe all of the items stated above are consistent with terms stated in your correspondence to me dated February 25 and March 28, 2002. Please review this offer with your client and contact me by Friday at noon.

The parties engaged in subsequent telephone conversations, and on 30 August 2002, appellee's counsel sent appellants' counsel a letter stating:

> I just want to follow up on our telephone conversation of August 30 regarding the possible settlement of the litigation. . . . I am going to refer to your August 28, 2002 letter to me because that contains the most recent settlement parameters.
>
> [The letter then reproduces the seven "settlement parameters" contained in seven paragraphs of the 28 August 2002 letter. All but one of the parameters, contained in paragraph five, was followed by bold type that stated "This is acceptable to [appellee]."]
>
> As you can see, [appellee] is in essential agreement with the terms outlined in your letter in six of the seven paragraphs. The only substantial difference is that we have given you a

more detailed proposal concerning the issues contained in Paragraph 5. . . . Hopefully, the parties can come together[.]

Finally, [appellee] has one additional term. As you know, Pad 3 is currently owned by [appellants], but it has not been improved. Should [appellants] not close by January 15, 2003 on the remaining three pads, [appellee] would have the option to buy back Pad 3 for $585,000. It would have 60 days from January 15, 2003 to exercise that option and 60 days after the date of exercise to close on the purchase of Pad 3.

I believe these are the main items that need to be agreed upon by the parties and I look forward to hearing from you and your client as soon as possible. At the present time, I would like to leave the deposition for Mr. Hollowell, which is scheduled for September 4, set so that we can take it if the parties cannot settle their claims before that time.

That same day, appellants' counsel responded with a letter reading in pertinent part:

[The parties] are very near agreement. First, the additional term regarding the repurchase of pad 3 is acceptable.

The sole matter remaining in dispute is whether [appellants] will be permitted to staff and otherwise market a model unit. Quite simply, we need to be able to market villas in the same manner that they have been marketed up to now. . . .

Please review this letter with your client and contact me. If you would like to speak with me later today, please call [.]

On 3 September 2002, appellants' counsel sent appellee's counsel an email stating:

I received your message and am pleased that we have reached an agreement. Please permit this email to confirm that Mr. Hollowell will hire an inside marketing agent/broker to handle sales of the villas and will not engage the services of an independent, third-party brokerage company. The remaining terms of the settlement agreement are consistent with those stated in our recent series of correspondence.

Further, in view of our settlement, please permit this email to confirm the depositions scheduled for later this week will not take place. . . .

On 6 September 2002, appellee's counsel sent the following email to appellants' counsel:

Here's the Mutual Release and Settlement Agreement I've drafted. Please contact me ASAP and let me know if any changes are necessary. If not, I'll have duplicate originals executed by our folks and you can have [appellant] do the same.

Based upon these communications, the trial court concluded that a valid settlement agreement existed between the parties on 6 September 2002.

Appellants first contend that the trial court erred in finding that the parties had reached a meeting of the minds. We disagree.

If supported by competent evidence, a trial court's findings of fact are conclusive on appeal. *Hill v. Town of Hillsborough*, 48 N.C. App. 553, 558, 269 S.E.2d 303, 306 (1980). "[M]utual assent and the effectuation of the parties' intent is normally accomplished through the mechanism of offer and acceptance." *Snyder v. Freeman*, 300 N.C. 204, 218, 266 S.E.2d 593, 602 (1980). In the instant case, the 28 August 2002 letter established appellants' willingness to "revisit" settlement options and their attempt to enter into a new agreement. The letter concluded by acknowledging its status as an "offer." In appellee's response to this letter on 30 August 2002, appellee's counsel acknowledged a possibility of settlement between the parties, accepted all but one of appellants' offered terms, and proposed an additional term. In his response sent the same day, appellants' counsel acknowledged that the parties were "very near agreement," and immediately accepted the additional term proposed by appellee. Appellants' counsel then discussed his client's position on the "sole matter remaining in dispute," and he invited appellee's counsel to call him with a response as early as that afternoon. In the email sent to appellee's counsel on 3 September 2002, appellants' counsel stated that he was "pleased that [the parties] [had] reached an agreement." The email "confirm[ed]" that the "sole matter remaining in dispute" on 30 August 2002 had been settled, and, "in view of [the] settlement," it "confirm[ed] the depositions scheduled for later [that] week w[ould] not take place." Thus, a valid offer was made and accepted in the correspondence between the parties. Therefore, we conclude the correspondence sufficiently supports the trial court's finding that the parties reached a meeting of minds.

While a meeting of the minds is essential to form an agreement between the parties, a contract is "nugatory and void for indefiniteness" if it leaves any "material portions open for future agreement." *Boyce v. McMahan*, 285 N.C. 730, 734, 208 S.E.2d 692, 695 (1974).

Defendants contend the agreement in the instant case is null and void because no final writing was ever executed by the parties. However, noting that the statute of frauds "does not require all of the provisions of the contract to be set out in a single instrument[,]" our Supreme Court has stated that "[t]he memorandum . . . is sufficient if the contract provisions can be determined from separate but related writings." *Hines v. Tripp*, 263 N.C. 470, 474, 139 S.E.2d 545, 548 (1965); N.C. Gen. Stat. § 22-2 (2003). We conclude the correspondence in the instant case was sufficient to satisfy the requirements of *Hines*.

The 28 August 2002 letter from appellants' counsel to appellee's counsel contained the purchase price of pads four through six as well as the date by which the purchase must have been closed. Both the 28 August 2002 letter and appellee's 30 August 2002 reply contained a sufficient description of the land to be sold. Each correspondence made clear that appellants were the buyers and appellee was the seller. Thus, the correspondence identified the parties, the purchase price, and the property to be sold. "These are the essential elements of the contract." *Yaggy v. B.V.D. Co.*, 7 N.C. App. 590, 600, 173 S.E.2d 496, 503, *cert. denied*, 276 N.C. 728 (1970). Therefore, we conclude that the trial court did not err in finding that the terms of the settlement agreement could be determined from the correspondence between the parties' attorneys.

Appellants also contend that because the settlement agreement in the instant case was agreed to by their counsel it was not "signed by the party to be charged therewith," and therefore violates the statute of frauds. N.C. Gen. Stat. § 22-2. We disagree.

"[T]he statute [of frauds] expressly recognizes that the writing which it requires may be signed by an agent, and it has long been established that the authority of the agent to do so need not be in writing." *Yaggy*, 7 N.C. App. at 600-01, 173 S.E.2d at 503. Nevertheless, "[s]pecial authorization from the client is required before an attorney may enter into an agreement discharging or terminating a cause of action on the client's behalf." *Harris v. Ray Johnson Constr. Co.*, 139 N.C. App. 827, 829, 534 S.E.2d 653, 655 (2000). However, "there is a presumption in North Carolina in favor of an attorney's authority to act for the client he professes to represent." *Id.* Thus, "[o]ne who challenges the actions of an attorney as being unauthorized has the burden of rebutting this presumption and proving lack of authority to the satisfaction of the court." *Id.*

In the instant case, as detailed above, the correspondence between counsel commenced with appellants' counsel making an offer on appellants' behalf, after first noting that he had "revisited settlement options" with appellants and that appellants were "willing to settle[.]" Hollowell was copied via facsimile and U.S. mail on each correspondence letter sent to appellee's counsel, including the 28 August 2002 letter opening negotiations and the 30 August 2002 letter stating that "[w]e have reviewed your letter and are very near agreement." Thus, we conclude sufficient evidence exists in the instant case to support the trial court's determination that appellants' counsel had the authority to bind his clients. Furthermore, appellants have not rebutted the presumption that their counsel acted on their behalf. Therefore, we hold that the trial court did not err in making its conclusion that the settlement agreement in the instant case was a valid contract.

Appellants maintain that the potential problems with the supply of water for Currituck Club ruined the value of the property they were to purchase under the settlement agreement. Appellants assert that because their purpose in purchasing the property was frustrated, the settlement agreement should be rescinded even if we conclude it is valid. However, assuming *arguendo* that a water shortage would destroy the value of the property included in the settlement agreement, we nevertheless decline to rescind the contract in the instant case.

The doctrine of frustration of purpose operates as a defense to a contract only if the frustrating event was not allocated to the complaining party by the terms of the contract and was not reasonably foreseeable to the party. *Brewer v. School House, Ltd.*, 302 N.C. 207, 211, 274 S.E.2d 206, 209 (1981). "The doctrine . . . is based upon the fundamental premise of giving relief in a situation where the parties could not reasonably have protected themselves by the terms of the contract against contingencies which later arose." *Faulconer v. Wysong & Miles Co.*, 155 N.C. App. 598, 601, 574 S.E.2d 688, 691 (2002) (quoting 17 Am. Jur. 2d Contracts § 401 (1964)).

In the instant case, we conclude appellants could have reasonably protected themselves by the terms of the settlement agreement. As appellants admit in their brief, "[t]he 1996 Contract provided protections to Appellants in the form of a representation that adequate water treatments [sic] facilities were present or would be constructed and a certain level of water and sewer capacity would be available." However, appellants chose not to seek such "protection"

by adding a similar provision to the settlement agreement, although the settlement agreement concerned the same property and parties as the 1996 Contract. We are unconvinced that appellants could not reasonably foresee a condition in 2002 that they had prepared for in 1996. Furthermore, for the doctrine of frustration to apply, "there must be an implied condition to the contract that a changed condition would excuse performance." *Id.* at 602, 574 S.E.2d at 691. After reviewing the correspondence between the parties, including the Mutual Release and Settlement Agreement, we conclude no such condition exists in the instant case. Therefore, we hold that the trial court did not err in enforcing the settlement agreement.

Affirmed.

Chief Judge MARTIN concurs.

Judge HUNTER dissents.

HUNTER, Judge, dissenting.

Since the parties did not reach a meeting of the minds and create an executed document setting out the terms of the settlement agreement, I disagree with the majority's conclusion that the trial court properly granted the Motions To Enforce Settlement Agreement, and therefore, I respectfully dissent.

I disagree with the trial court's findings and conclusions that there was a settlement agreement between the parties on 6 September 2002. For our appellate review, the findings were not supported by competent evidence. *Hill v. Town of Hillsborough*, 48 N.C. App. 553, 558, 269 S.E.2d 303, 306 (1980). Likewise, "[t]he conclusions of law drawn by the trial court from its findings of fact are fully reviewable *de novo* by the appellate court." *Mann Contr'rs, Inc. v. Flair with Goldsmith Consultants-II, Inc.*, 135 N.C. App. 772, 775, 522 S.E.2d 118, 121 (1999) (citing *Humphries v. City of Jacksonville*, 300 N.C. 186, 187, 265 S.E.2d 189, 190 (1980)).

Here, the trial court's conclusions are not sufficiently supported by competent evidence. Appellee filed a breach of contract suit against appellants on 1 June 2001 and appellants filed a counter lawsuit against appellee on 20 September 2001. Before these cases were heard, the parties engaged in extensive negotiations to settle their contested claims. Appellee eventually filed motions to enforce the terms of the negotiations, which were granted by the trial court.

Courts should be extremely cautious in determining that parties have entered into a settlement agreement when the only evidence is multiple correspondence and documents exchanged between their counsel, but no documents signed by the parties which formalize the agreement. Here, the parties' counsel, through e-mails and letters, constantly stated that "execution of a settlement agreement" was a provision to settling their claims. All terms were never completely agreed upon, and even if they were, the parties never signed a document finalizing the agreement.

For a valid contract to exist, the parties must have a meeting of the minds concerning material terms. *Chappell v. Roth*, 353 N.C. 690, 548 S.E.2d 499 (2001). In that case, our Supreme Court opined:

> The "mutually agreeable" release was part of the consideration, and hence, material to the settlement agreement. The parties failed to agree as to the terms of the release, and the settlement agreement did not establish a method by which to settle the terms of the release. Thus, no meeting of the minds occurred between the parties as to a material term; and the settlement agreement did not constitute a valid, enforceable contract.

*Id.* at 693, 548 S.E.2d at 500.

As in *Chappell*, there was no meeting of the minds in the case now before us. The parties' correspondence shows that negotiations and revisions of the settlement documents went before and beyond 6 September 2002. The evidence tends to show through the correspondence that both parties' counsel had agreed on (1) the numbered items that appellants proposed on 28 August 2002, (2) appellee's suggested "buy-back" clause of Pad 3 proposed on 30 August 2002, and (3) appellant's marketing capabilities on 3 September 2002. However, the parties never agreed to all of the terms of the final document, and its execution was a material fact and condition to the parties having an agreement.

In contrast, in *Bank v. Wallens and Schaaf v. Longiotti*, 26 N.C. App. 580, 217 S.E.2d 12 (1975), this Court opined that reference to a more complete document does not necessarily indicate that material portions of the agreement have been left open for future negotiations. It could mean only that immaterial matters, which are of no consequence, will be added to complete the agreement. *Id.* However, in the case before us, the final document was material to their agreement. The parties' counsel made changes to it until 7 March 2003, in order

for the agreement to be executed and finalized at closing, which never occurred.

Starting on 25 February 2002 with appellee's counsel offering to settle with an "execution of a settlement agreement," the parties began to show their intent not to be bound until they executed a settlement agreement. Appellants' willingness to settle on 28 August 2002 was based on "termination of the current contract (and its modifications) and the execution of a new agreement[.]" Appellee did not object to that requirement in its 30 August 2002 e-mail response and counsel stated "[he was] going to refer to [appellants'] August 28, 2002 letter to [him] because that contain[ed] the most recent settlement parameters."

Then, on 3 September 2002, appellants' counsel stated in an e-mail that he was "pleased that [they had] reached an agreement. . . . The remaining terms of the settlement agreement [were] consistent with those stated in [their] recent series of correspondence." That recent series of correspondence included both parties agreeing that they wanted the execution of a settlement agreement, a mutual release and a non-disparagement clause. In response to appellants' counsel's e-mail, on 6 September 2002, appellee's counsel sent an e-mail with an attached Mutual Release and Settlement Agreement, and he asked to be notified if any changes were necessary.

The evidence also tends to show that in the 2 September 2002 e-mail to appellee's counsel, appellants' counsel stated "in view of [the] settlement, please permit [that] e-mail to confirm the depositions scheduled for later [that] week [would] not take place." On 23 December 2002, appellee's counsel stated "[t]he parties ha[d] a settlement. [Appellant could not] now come up with some 'issues' to try to back out of the agreement." Nevertheless, these statements do not undermine both parties' expressed desire to have an executed contract and their continuous negotiations to finalize their agreement by executing a document setting it out.

After 6 September 2002, the parties continued to negotiate in correspondence dated 2 October 2002, 3 October 2002, 16 October 2002, 26 November 2002, 2 December 2002, 16 December 2002, 19 December 2002, 23 December 2002, 3 January 2003, 8 January 2003, 14 January 2003, 7 March 2003 and 24 March 2003. On 2 October 2002, appellee's counsel asked for comments on the Settlement Agreement "so [they could] keep [the] settlement moving towards finalization."

On 11 November 2002, the parties began to have additional communication involving appellants' concerns about the potable water system in the Currituck Club. On 8 January 2003, appellants' counsel stated his client had deposited money in the trust account "for use in closing the transaction contemplated by [their] settlement negotiations in the event a settlement [was] ever reached." Because of the water supply concerns, a stormwater easement was included on 14 January 2003 as an additional document to finalize the agreement, which did not exist on 6 September 2002.

On 7 March 2003, appellee's counsel offered:

[I]f [appellants did] not desire to sell back Pad 3 to [appellee], but prefer[ed] to retain it, that would be satisfactory. . . . [He] believe[d they could] conclude the settlement by simply having documents executed that relieve[d appellants] from any obligation to purchase Pads 4-6 and relieve[d appellee] of any obligations to sell [appellants] Pads 4-6.

This e-mail shows that appellee was offering terms different from what the parties had negotiated by 6 September 2002. Furthermore, as late as 24 March 2003, appellee's counsel sent an e-mail in response to a telephone conversation with appellants' counsel the previous week. It suggested that appellants had proposed different terms to replace the previous negotiations, including that appellants did not intend to buy Pads 4-6 and wanted to sell to appellee their two condos in the Currituck Club. These last communications between appellee and appellants indicate that the parties were still negotiating the terms of the contract. By 24 March 2003, over twenty-eight weeks after 6 September 2002, they had not entered into a formalized agreement.

In addition, as found in *Hines v. Tripp*, 263 N.C. 470, 139 S.E.2d 545 (1965), the statute of frauds "does not require all of the provisions of the contract to be set out in a single instrument." *Id.* at 474, 139 S.E.2d at 548. However, a contract is "nugatory and void for indefiniteness" if it leaves any "material portions open for future agreement." *Boyce v. McMahan*, 285 N.C. 730, 734, 208 S.E.2d 692, 695 (1974). The facts of the case *sub judice* show that even if the statute of frauds' written requirements for entering into a valid contract for land were satisfied, these parties never agreed to be bound by any contractual terms until they executed the finalized agreement or signed other binding documents. As further proof, the following clause was included in each draft of the proposed settlement agree-

ment: "13. COUNTERPARTS: This Settlement Agreement may be executed in multiple counterparts and *shall be binding upon all parties when a counterpart has been signed by all parties hereto* and for all intents and purposes as if all of the parties had signed a single document." (Emphasis added.)

The parties never signed separate documents nor did they sign this agreement and thus, were not bound by any of the settlement agreement negotiations at any time.

Therefore, I disagree with the majority because the parties contemplated the execution of a settlement agreement to finalize their negotiations and did not on 6 September 2002 have the present intent to be bound by any terms. I would hold that the trial court erred in granting the Motions to Enforce Settlement Agreement and I would let the lawsuits proceed accordingly.