Golden Triangle #3, LLC v. RMP-Mallard Pointe, LLC, 2022 NCBC 43.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

GOLDEN TRIANGLE #3, LLC,

      Plaintiff and
      Counterclaim
      Defendant,

v.

RMP-MALLARD POINTE, LLC, and
MALLARD CREEK ASSOCIATES
#1, LLC,

      Defendants and
      Counterclaim
      Plaintiffs,

and

RMP-MALLARD POINTE, LLC,

      Third-Party
      Plaintiff,

v.

LEVINE PROPERTIES, INC.,

      Third-Party
      Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 13580

**ORDER AND OPINION ON MOTIONS
FOR SUMMARY JUDGMENT
[PUBLIC[1]]**

1. THIS MATTER is before the Court on (i) Defendants RMP-Mallard Pointe, LLC ("RMP") and Mallard Creek Associates #1, LLC's ("MCA"; together, "Defendants") Motion for Summary Judgment (the "Motion for Summary

---

[1] Because certain of the materials referenced in this Order and Opinion were filed under seal with the Court, (*see* Ord. Mots. Seal, ECF No. 95), the Court initially filed this Order and Opinion under Seal and permitted the parties to propose redactions. The parties did not propose redactions; the Court therefore finalizes this Order and Opinion for the public docket without redactions.

Judgment"), (ECF No. 60), and (ii) Plaintiff Golden Triangle #3, LLC ("Plaintiff" or "Golden Triangle") and Third-Party Defendant Levine Properties, Inc.'s ("LPI") Motion for Partial Summary Judgment (the "Motion for Partial Summary Judgment"; collectively, the "Motions"), (ECF No. 66).

2.     Beginning in 2013, the parties in this case envisioned plans to work together to redevelop real property located at the intersection of Fairview and Providence Roads near SouthPark, a high-end commercial and residential area in Charlotte, North Carolina (the "Project"). By all accounts, the Project had great potential. However, disagreements, largely over financing, brought the Project to a grinding halt and, despite efforts, the parties have been unable to agree on terms either to move forward or to separate. They come to the Court with cross-motions for summary judgment, each arguing that the other has breached the agreements between them.

3.     Having considered the Motions, the related briefing, the arguments of counsel at a hearing on the Motions, the parties' Joint Stipulation of Undisputed Facts, and other relevant matters of record, the Court hereby GRANTS Plaintiff's Motion with respect to Defendants' Second and Third Counterclaims but otherwise DENIES the Motions as provided herein.

> *James, McElroy & Diehl, P.A., by John R. Buric, Preston O. Odom, and John R. Brickley, for Plaintiff Golden Triangle #3, LLC and Third-Party Defendant Levine Properties, LLC.*
>
> *Lincoln Derr PLLC, by R. Jeremy Sugg and Tricia M. Derr, for Defendants RMP-Mallard Pointe, LLC and Mallard Creek Associates #1, LLC.*

Earp, Judge.

## I.    FACTUAL BACKGROUND

4.    The Court does not make findings of fact on motions for summary judgment.  Instead, the Court summarizes material facts it considers to be uncontested.  *See, e.g.*, *Vizant Techs., LLC v. YRC Worldwide, Inc.*, 373 N.C. 549, 551 (2020).  In this case, the Court is aided by the parties' Joint Stipulation of Undisputed Facts.  (Jt. Stip. Undisputed Facts [hereinafter "Jt. Stip."], ECF No. 107.)

5.    MCA and RMP are related North Carolina limited liability companies ("LLC(s)") in which David Miller ("Miller") is a principal.  (Compl. ¶¶ 2–4, ECF No. 3; Jt. Stip. 6.)  LPI and Golden Triangle (also referred to in the record as "Levine") are North Carolina entities in which Daniel Levine is a principal.  (Compl. ¶ 1, Answer, Countercl., & Third-Party Compl. [hereinafter "Countercls."] ¶ 15, ECF No. 9.)  The real property at issue in this case is located at a busy intersection.  (Compl. ¶ 9.)  The land is divided into two parcels: an approximately ten-acre tract owned by MCA (the "Land") and an approximately half-acre piece owned by Levine on which a convenience store formerly operated (the "C-store parcel").  (Countercls. ¶ 16; *see* Stip. Agrs. Parties [hereinafter "Stipulations"], at 000197–210 [hereinafter "Am. Option Agr."], ECF No. 25.2.)

6.    The Land is subject to a lease (the "Ground Lease"), requiring the lessee to maintain apartment units that occupied the Land, as well as any related

improvements (the "Property").[2]  (*See* Stipulations, at 00043–182 [hereinafter "Ground Lease"].)

7.      MCA purchased the Land in 2005 and became lessor under the pre-existing Ground Lease.  (Jt. Stip. 4; Stipulations, at 000151–55.)  In 2012, MCA exercised an option to purchase the apartments on the Land pursuant to a right of first refusal.  (Jt. Stip. 5; Dep. David Miller [hereinafter "Miller Dep."] 8:10–15, ECF No. 61.2.)  The plan was for MCA to then assign the purchase agreement to an entity affiliated with Levine as part of a larger agreement between Miller and Levine together to form an LLC for the redevelopment of the property.  (*See* Jt. Stip. 6; Miller Dep. 8:22–24; Dep. Daniel Levine [hereinafter "Levine Dep."] 34:7–16, ECF No. 61.3; Dec. 21, 2012 Email, ECF No. 61.4.)

8.      Miller, with experience in commercial leasing, and Levine, with experience in multi-family residential property, saw the potential for a mixed-use project at this prime location if they could get the appropriate zoning.  If not, they agreed to renovate the aging apartments and improve the rent stream.

9.      Miller and Levine formalized their plans in an Option Agreement on 15 March 2013, (Stipulations, at 000183–96), and amended that agreement on 9 December 2014 to add the C-store parcel (the "Amended Option Agreement"), (Jt. Stip. 7–8; *see generally* Am. Option Agr.).  MCA, RMP, and Levine's entity, Golden Triangle, each signed the Amended Option Agreement, (Jt. Stip. 9; Am. Option Agr.,

---

[2] The Ground Lease was originally executed in 1972 and has been assigned, modified, and amended at various points since then.  (Jt. Stip. 2.)

at 13), and MCA then assigned the apartments to Golden Triangle, (Stipulations, at 000024–41).

10. Included as Exhibit C to the Amended Option Agreement was a draft Operating Agreement for the LLC that was to be formed and that ultimately became known as Carmel Providence, LLC ("Carmel" or the "LLC"). (Stipulations, at 000214–80 [hereinafter "Mod. Operating Agr."]; Jt. Stip. 11.)

11. Therefore, three agreements form the basis of the parties' current disputes: (i) the Ground Lease, (ii) the Amended Option Agreement; and (iii) the Operating Agreement for Carmel.

A. **The Ground Lease**

12. The term of the Ground Lease is 99 years. (Ground Lease, at § 3.) It specifies that the lessee "agrees to use and occupy the Premises in a careful, safe and proper manner, and will not commit waste thereon." (Ground Lease, at § 9.3.) In addition, the Ground Lease required Golden Triangle to deliver the Property at the end of the lease back to MCA "in good condition and repair[.]" (Ground Lease, at § 14.)

13. Rent under the Ground Lease is calculated starting with "Basic Rent" in the amount of $15,000.00. (Ground Lease, at § 5.2.) "Additional Rent," "consisting of ten percent (10%) of the increase in annual apartment rental income derived from the Improvements[3] computed at five-year intervals" is to be determined according to

---

[3] "Improvements" is defined in the Ground Lease as buildings, structures, and improvements including "community and recreational facilities, swimming pools, tennis courts, fences, appliances, [and] heating and air conditioning equipment[.]" (Ground Lease, at § 2.1.)

a specific calculation and then added to Basic Rent to determine the amount MCA was to receive from Golden Triangle annually. (Ground Lease, at § 5.4.)

14. The Lease Year runs from 15 February to 14 February. (Jt. Stip. 3; Ground Lease, at § 3.2.)

15. An amendment to the Ground Lease dated 15 March 2013 (the "2013 Lease Amendment"), (Stipulations, at 000174–82 [hereinafter "Ground Lease Am."]), changed the rent calculation from 14 February 2014 through 14 February 2018, but only if (i) RMP and Golden Triangle chose not to pursue rezoning, or (ii) RMP and Golden Triangle were unsuccessful in their rezoning efforts. In either of those events, rent to be paid for the five-year period beginning 15 February 2018 was to be recalculated in accordance with Exhibit B to the 1997 Lease Amendment, but in any event would be no less than $150,000.00 per year. (Ground Lease Am., at § 2.)

16. As discussed below, in May 2017, Levine demolished the apartments. But because the parties have been unable to agree on financing, plans to redevelop the Land have stalled. Even with the apartments demolished and the Property no longer generating revenue, Golden Triangle, as lessee of the Land, remains obligated to MCA for rent under the Ground Lease. It has tendered a rent payment each year to MCA, which MCA has accepted. (Jt. Stip. 10.) However, MCA contends that the amount of rent Golden Triangle has paid is insufficient and seeks to enforce its rights under the Ground Lease.

B. **The Amended Option Agreement**

17. At the time the parties entered into the Option Agreement, both the Land as well as the apartments on the Land were subject to loans. The Land was encumbered to BB&T for approximately $1.5 million (the "BB&T Loan"), and the apartments were subject to a loan from KeyBank for approximately $5.3 million (the "KeyBank Loan"). (Jt. Stip. 12; Am. Option Agr., at 1.)

18. The Amended Option Agreement contains the following provisions, in relevant part:

> a. Levine and RMP were to "conduct an investigation of a potential rezoning of the Land and C-Store Parcel[,]" and if rezoning was ultimately successful, they were to "form the LLC[.]" (Am. Option Agr., at § 1(b)(i).)
>
> b. "Upon the . . . successful Rezoning of the Land and C-Store Parcel . . ., the Parties promptly (and not later than thirty (30) days after the successful Rezoning . . .) shall cause Articles of Organization for the LLC to be filed with the office of the Secretary of State of North Carolina, and both Parties shall sign the Operating Agreement attached hereto as <u>Exhibit C</u> . . ., make the contributions of the C-Store Parcel (including an assignment of any leases related thereto), Land and Property (as defined in the Purchase Agreement), and other capital to the LLC as and when required in the Operating Agreement and become members of the LLC. (Am. Option Agr., at § 1(d); *see* Mod. Operating Agr.)
>
> c. "Notwithstanding anything contained in this Agreement, the parties hereto agree that the capitalization of the LLC as set forth in this [section] shall not occur until the closing of the Project Financing (as defined below) at which time the KeyBank Loan and the BB&T Loan or the then outstanding loans . . . shall be contemporaneously paid in full." (Am. Option Agr., at § 1(d).)
>
> d. "With respect to the initial financing obtained for the LLC (the "Project Financing"), **the LLC will use its best efforts to obtain either construction financing (if the C-store Parcel and Land are rezoned and a new retail development is**

**pursued) or permanent financing (if the Apartments are renovated) with a loan-to-value of not less than seventy-five percent (75%)**.   (Am. Option Agr., at § 1(d) (emphasis added).)

   e.   An option was available to Golden Triangle if RMP "fail[ed] to comply with its obligation to form and contribute to the LLC" as required by Section 1(d) of the Option Agreement (the "Levine Option").   (Am. Option Agr., at § 1(e)(i).)   The Levine Option enabled Golden Triangle to purchase the Land at $3,085,000,[4] the price MCA paid for it in 2005.   (Jt. Stip. 14; Am. Option Agr., at § 1(e)(i), (iv)); *see also* Miller Dep. 212:4–18.)

## C. <u>The Operating Agreement</u>

19.   The Operating Agreement was attached to the Amended Option Agreement as Exhibit C.   However, the parties agreed that if they were successful with their rezoning efforts, they would add the terms in another exhibit to the Amended Option Agreement, contained in Exhibit E, to their Operating Agreement. (Stipulations, at 000291–92.)   Among other things, these additional terms included a requirement that the provisions in the Operating Agreement that related to Levine's renovation of the existing apartment complex during the first two years following Levine's acquisition were to be deleted.   (Stipulations, at 000291.)   The completed document, once modified to include the additional terms post-rezoning, is referenced by the parties as the "Modified Operating Agreement."

20.   The Modified Operating Agreement contained the following provisions, in relevant part:

   a.   RMP and Golden Triangle were to own the newly-created LLC (Carmel) as equal members.   (Jt. Stip. 16; Mod. Operating Agr.,

---

[4] The provision contradicts itself, stating, "The purchase price . . . for the Land shall equal Three Million *Thirty-five Thousand* and No/100 Dollars ($*3,085,000.00*)." (Am. Option Agr., at § 1(e)(iv) (emphasis added).)

at § 1.33.) LPI was to serve as manager. (Jt. Stip. 20; Mod. Operating Agr., at § 6.1(b).)

b. Both the LLC's members and its manager were required to use **"good faith, diligent efforts to obtain and close a Loan for the Project (the "Project Financing") approved by the Members."** (Jt. Stip. 17; Mod. Operating Agr., at § 5.1(a) (emphasis added).)

c. The members were to make their initial capital contributions once financing was secured. (Mod. Operating Agr., at § 5.1(a).) RMP was to cause MCA to convey the Land to the LLC at that time and Golden Triangle was to contribute the Property, each subject to their existing debts. (Mod. Operating Agr., at § 5.1(a)(i)–(ii).)

d. Levine and RMP, "or affiliates thereof," were to provide all guaranties and indemnities relating to any recourse loan. Section 5.5(a) states: "To the extent obtainable, such guaranties for a [r]ecourse [l]oan shall be several, but not joint, in accordance with each Member's Percentage Interest." (Jt. Stip. 18; Mod. Operating Agr., at § 5.5(a).) Exhibit E (discussed below) also addressed guaranties and similarly states that "Any construction loan guaranties shall be several to the extent that the lender will agree to a several guaranty or if the lender will not agree to several guaranties, the construction loan guaranties shall be joint and several to the RMP principals and the Levine principals." (Jt. Stip. 19; Mod. Operating Agr., at Ex. E.)

e. Either member could transfer all or part of its interest to an Affiliate, defined in part as any entity in which a member had an interest greater than ten percent (10%) or was otherwise subject to the member's control or common control, without the consent of the other member. (Mod. Operating Agr., at § 9.10; *see* Mod. Operating Agr., at § 1.3.)

21. The parties' jointly-submitted rezoning application was approved on 19 October 2015. (Jt. Stip. 21.)

22. Articles of Organization for Carmel were filed on 30 August 2016. (Jt. Stip. 24; Countercls. ¶ 89.) And, although the parties never formally executed the

Modified Operating Agreement, they now agree that it went into effect on 30 August 2016, when Carmel was formed. (Jt. Stip. 25.)

D. **Financing Efforts**

23. In fall 2015, the parties anticipated that the Project would include the development of a grocery store, two retail outparcels, a five- or six-story apartment building, and a parking garage with retail establishments on the ground floor. (Jt. Stip. 22.) However, after the initial rezoning was approved, the city amended its zoning ordinance to allow for self-storage below the parking garage, prompting the parties to request a site plan amendment ("SPA"). (Jt. Stip. 26–27; Miller Dep. 26:8–18.) Their SPA application was approved on 17 January 2017. (Jt. Stip. 28.) It is undisputed that the parties' rezoning efforts were more successful than they had originally planned. (Jt. Stip. 29.)

24. Neither the Amended Option Agreement nor the Modified Operating Agreement contained a specific term with respect to the Project's scope, allowing for its expansion. But this expansion carried with it greater cost, and the parties' approaches for managing the increase in cost differed. (Jt. Stip. 30.) Securing financing in accordance with the terms of the parties' agreements also proved difficult. Nevertheless, given the language of the Amended Option Agreement that "capitalization of the LLC. . . shall not occur until the closing of the Project Financing[,]" it was the necessary first step. (Am. Option Agr., at § 1(d).)

25. It was important to Miller that the Project be financed seventy-five percent (75%) loan-to-value. (*See, e.g.*, Miller Dep. 95:17–20 ("[W]e had determined

that we were going to use best efforts to pursue total financing on a construction loan equal to 75 percent of value[.]").) The parties had also agreed that RMP and Golden Triangle, as members of Carmel, were each to own equal fifty percent (50%) interests. (Jt. Stip. 16.) Miller suggested that the project be scaled back. Levine opposed that idea. (*See, e.g.*, Sept. 17, 2018 Email, ECF No. 61.39 (Levine stating "As you know, the deal we originally contemplated has changed and grown significantly in scope and complication. I believe it has evolved to be a terrific deal and for the better.").)

26. Miller suggested that a mezzanine lender be utilized to fill any gaps in equity. (Miller Dep. 85:11–86:6, 94:19–95:9; Levine Dep. 234:9–24.) Levine was also opposed to this proposition. (Levine Dep. 234:16–24 (stating that his response was "unequivocal[ly]" "[a]bsolutely not"), 326:17–327:9 (stating that a mezzanine lender was not part of his "deal").)

27. Failing to get Levine's agreement on those solutions, and recognizing that the Modified Operating Agreement permitted transfer of RMP's interest to an Affiliate, Miller began a search for a partner to assist in raising the additional equity that would be required under a larger project. (Jt. Stip. 31; Miller Dep. 94:19–95:9, 141:25–42:13; *see* Mod. Operating Agr., at § 9.10.) Levine did not object to the concept of Miller taking on an equity partner. (Jt. Stip. 32.)

28. Meanwhile, with Miller's knowledge, Golden Triangle had begun de-leasing the apartments in November 2015. (Jt. Stip. 23.) In May 2017, even though financing still had not been decided, Golden Triangle began demolition of the apartments and Levine paid off the KeyBank loan. (*See* Levine Dep. 199:9–17, 200:6–

8, ECF No. 83.7; Tr. 28:17–22, ECF No. 108; Defs.' Br. Opp'n Pl. & LPI's Mot. Partial Summ. J. [hereinafter "Defs.' Br. Opp'n"] 5, ECF No. 83.)

29. Things heated up on 26 October 2017 when Golden Triangle, through counsel, sent a letter to RMP urging that "it [was] time to . . . fund the capital as required in the [Amended] Option Agreement and the [Modified] [O]perating [A]greement[.]" (Oct. 26, 2017 Letter, ECF No. 61.6; *see* Jt. Stip. 33–34.) Although he recognized that capital contributions were contingent on closing the Project Financing, Levine believed the parties were in a catch-22 position, because closing on financing for the now larger project would require "a substantial cash equity infusion from both parties." (Oct. 26, 2017 Letter.) The letter outlined additional steps to be followed immediately, including each party executing the Modified Operating Agreement. It also referenced a recalculation of Levine's capital account (post-payment of the KeyBank loan), predicted a capital call to meet the Project's needs, and warned that if RMP elected not to make the capital contribution required to close the Project Financing, Golden Triangle anticipated exercising its rights to adjust RMP's Percentage Interest. "In the event that [RMP] is not amenable to following the procedures[,]" the letter warned, "then [Golden Triangle] hereby provides notice of its option to purchase the Land from [MCA] as set forth in Section 1(e) of the [Amended] Option Agreement [the Levine Option]." (Oct. 26, 2017 Letter.)

30. Miller responded on 3 November 2017, observing that Section 1(d) of the Amended Option Agreement and Section 5.1 of the Modified Operating Agreement required that Carmel be capitalized *after* Project Financing had been arranged.

Denying that RMP had failed to comply with the Amended Option Agreement, Miller rejected Golden Triangle's attempt to exercise the Levine Option. Finally, agreeing that the Modified Operating Agreement should be executed, but observing that it had yet to be prepared in final form, Miller closed his letter stating, "Please let me know if you or I should follow up on . . . making the necessary amendment to the Operating Agreement to include the terms specified in Exhibit E." (Nov. 3, 2017 Letter, ECF No. 61.7; *see* Jt. Stip. 35–36.)

31. Meanwhile, the parties separately sought financing. (*See* Levine Dep. 217:6–18:2.) Miller made progress with BB&T, which on 8 February 2018 issued two options for financing in the form of nonbinding term sheets. (*See* February 5, 2018 Email, ECF No. 61.9; Jt. Stip. 38.) However, when representatives of BB&T attempted to collect financial information from Golden Triangle to determine if the bank would issue a commitment on the terms, Levine, who did not believe that BB&T's terms were favorable, declined to provide the requested information. (Dep. LPI 53:18–24, ECF No. 61.5; Dep. BB&T 15:4–16:21; Dec. 7, 2017 Email, ECF No. 61.12.) BB&T issued another term sheet in March 2018. (Jt. Stip. 41.) In response to BB&T's request for information needed to progress to a loan commitment, LPI provided some information but then told BB&T to "put all [its] inquiries on hold" and refused to provide the remaining information requested, stating that "we are going to wait on going any further with the BB&T underwriting for the Carmel project." (May 18, 2018 Email, ECF No. 61.19.)

32.     Levine believed that the BB&T loan was too costly with respect to both its rate and its term. (Levine Dep. 306:13–14.) But Miller believed a five-year term was necessary and pointed out that BB&T was also able to accommodate the preference for several guaranties that was set out by the parties' agreements. (*See* Defs' Br. Ex. 14, at BBT 001699, ECF No. 61.15 (under seal); Defs' Br. Ex. 23, at RMP 0042205, ECF No. 61.24 (under seal); Defs.' Br. Ex. 20, at WFB 149, ECF No. 61.21 (under seal); Levine Dep. 337:9–14.)

33.     In the meantime, Levine reached out to four banks. He ultimately sought, and received, a loan commitment from Wells Fargo in April 2018 on terms that he considered to be more favorable than BB&T's terms. The interest rate and fees for the Wells Fargo loan were lower than that offered by BB&T. (*See* Apr. 19, 2018 Email, ECF No. 61.17; Jt. Stip. 39, 42–43.) However, the Wells Fargo loan had a three-year term and required joint and several guaranties among all the guarantors. (Jt. Stip. 44.) And, because Wells Fargo did not like some of the terms of the Modified Operating Agreement, it requested a revised operating agreement that would give Levine more control over the Project. (Wells Fargo Dep. 45:20–46:8, ECF No. 61.10.)

34.     Levine was in favor of the Wells Fargo terms, but Miller was not. He expressed concern that the three-year term would put Carmel at risk of default. (*See* Levine Dep. 338:8–12.) He pointed out that the loan did not accomplish the 75% loan-to-value condition in the Amended Option Agreement. He also objected to the inclusion of joint and several, as opposed to several, guaranties. (*See* May 6, 2018

Email, ECF No. 61.25; Defs.' Br. Supp. Mot. Summ. J. 8, ECF No. 61; *see also* Mod. Operating Agr., at § 5.5.)

35. Given the parties' disagreement, the Wells Fargo commitment letter was never signed. (Wells Fargo Dep. 107:8–08:11.)

36. During this period, Miller was separately negotiating with Morgan Capital ("Morgan") to be the LLC's equity partner. (*See* Morgan Emails, ECF No. 61.26.) The idea was that RMP and Morgan would form a new entity to which RMP's interest in Carmel would be transferred. Morgan would then contribute $7 million to the new entity and RMP would contribute the Land to Carmel. (*See* Operating Agr. [hereinafter "Morgan Operating Agr."], at § 5.1, ECF No. 61.27.) However, Morgan conditioned its involvement on formal execution of the Modified Operating Agreement and on not being required to guarantee Project financing. (*See* Morgan Operating Agr., at § 5.1(b).) Levine objected to not requiring Morgan to guarantee Project financing and believed the arrangement to be contrary to the language of the Modified Operating Agreement. (Levine Dep. 382:17–20.)

37. In August 2018, Miller again emailed Levine about execution of the Modified Operating Agreement so that Miller could finalize his deal with Morgan. (Aug. 7, 2018 Email, ECF No. 61.31.) In response, Levine presented a new proposed operating agreement containing significant revisions. (Sept. 14, 2018 Email, ECF No. 61.37.) Miller reacted strongly. He returned a redlined draft to Levine highlighting the changes, along with an email saying, "This new document is significantly different than our previously agreed upon operating agreement and

makes numerous changes which we have never discussed. (most of which are detrimental to us and beneficial to you)." He underscored the need for a meeting to discuss and resolve the issue "or I run the risk of losing the closing window for the [Morgan] transaction which could significantly delay any loan closing." (Sept. 14, 2018 Email, ECF No. 61.38.) Levine responded that the new agreement was necessary "to embrace the sophisticated deal structure" because "the deal we originally contemplated has changed and grown significantly in scope and complication." (Sept. 17, 2018 Email, ECF No. 61.39.)

38.   When the two sides could not agree, Morgan backed away. (Miller Dep. 108:18–21.)

39.   Miller also approached BB&T on 29 August 2018 to determine if it was willing to revise its terms to make its loan "more competitive[.]" (Aug. 29, 2018 Email, ECF No. 61.42; Jt. Stip. 45.) Miller says he did so at Levine's behest, but Levine says Miller's actions reflect his own disapproval of BB&T's terms. When BB&T declined to change its terms, Levine emphasized to Miller that the Wells Fargo "COMMITMENT [was] the only way forward!" (Oct. 30 Email, ECF No. 61.44 (emphasis in original); Jt. Stip. 46–49.)

### E. Negotiations Break Down

40.   On 2 November 2018, the parties met to try to work out their differences. (*See* Nov. 2, 2018 Email, ECF No. 61.45.) When efforts failed, they met again on 5 November 2018 to discuss separation, but they were unable to come to an agreement even on how to separate. (*See* Levine Dep. 401:25–02:4.)

41.     On 15 November 2018, Levine wrote to Miller, "As you might imagine, I am anxious to get back together and agree on how we might . . . move forward on a process to bring our proposed partnership to a mutually agreeable conclusion. . . . Our proposed partnership has reached a point that we both acknowledge can't move forward." (Nov. 15, 2018 Email, ECF No. 61.48.)

42.     The parties' recognition that they were at an impasse was complicated by the fact that Golden Triangle, at Levine's direction, had demolished the apartments in May 2017. (*See* Feb. 16, 2019 Letter, ECF No. 61.50.) On 19 December 2018, Levine emailed Miller regarding Golden Triangle's rent obligation. Levine was of the view that only $15,000.00, the base amount of annual rent, was due for the year 2019. (Dec. 19, 2018 Email, ECF No. 61.49.)

43.     Miller responded by email later that day pointing out that provisions in a September 2005 amendment to the Ground Lease established a floor for "Additional Rent" to be added to the $15,000.00 base rent. The floor was not to be less than the Additional Rent payable for the preceding five-year period ($85,650.00). Therefore, Miller stated, the total rent for 2019 was $100,650.00. And, after stating that the Ground Lease contemplated a return of the apartments at the conclusion of its term (something obviously prevented by the demolition), Miller requested that Levine provide him with the latest rent roll and profit and loss statements for the property prior to demolition of the apartments so that they could determine a fair market rent for each unit to use in the rent calculation for new the five-year period beginning 15 February 2019. In any event, Miller contended, the 15 March 2013 Amendment to

the Ground Lease contemplated that, if they did not move forward with redevelopment, rent beginning in February 2019 would be at least $150,000.00. (Dec. 19, 2018 Email.)

44. As lessor, MCA notified Levine on 16 February 2019 that, by demolishing the apartments, it considered Golden Triangle to be both in default of the Ground Lease and in breach of the Amended Option Agreement. In addition to destroying income-producing property, MCA contended that Golden Triangle owed but had failed to pay $150,000.00 in rent under the terms of the lease. (Feb. 16, 2019 Letter.)

45. On 15 March 2019, Golden Triangle, LPI, and Levine, through counsel, responded to MCA's letter contesting the rent calculation of $150,000.00, asserting that RMP was in breach of the Amended Option Agreement, and stating their expectation that the parties would execute the Modified Operating Agreement at "our meeting next week." (Mar. 15, 2019 Letter, ECF No. 61.51.)

46. To date, the Modified Operating Agreement remains unsigned.[5]

47. On 1 May 2019, Golden Triangle, taking the position that RMP had not met its obligations under the Amended Option Agreement, purported to exercise the Levine Option to force RMP to sell it the Land at the price for which MCA purchased it in 2005. (May 1, 2019 Letter, ECF No. 61.52.) MCA denies that the Levine Option has been triggered and refuses to sell the Land. Defendants further argue that Golden Triangle's late presentation of the Modified Operating Agreement for

---

[5] Despite the lack of signatures, the parties agree that the Modified Operating Agreement took effect when the Articles of Organization were filed on 30 August 2016. (Jt. Stip. 25.)

execution in March 2019 was an attempt on its part to "manufacture the appearance of a breach" by RMP. (June 7, 2019 Letter, ECF No. 61.53.) This litigation followed.

## II.   PROCEDURAL BACKGROUND

48.   Plaintiff initiated this action by filing its Complaint on 10 July 2019, asserting claims for breach of the Amended Option Agreement, and for a declaratory judgment that (i) RMP failed to comply with its obligations under the Amended Option Agreement, (ii) Plaintiff is entitled to exercise the Levine Option, and (iii) MCA is required to sell the Land to Plaintiff, or alternatively, that RMP is required to execute and comply with its obligations under the Modified Operating Agreement. (Compl., ECF No. 3.)[6]

49.   Defendants answered the Complaint on 10 September 2019, asserting counterclaims for (i) declaratory judgment establishing that the Amended Option Agreement was rescinded, (ii) declaratory judgment establishing that the Amended Option Agreement is void due to impracticability, (iii) declaratory judgment establishing that the Amended Option Agreement is void due to frustration of purpose, (iv) restitution, (v) breach of the Ground Lease, and (vi) declaratory judgment regarding the parties' rights under the Ground Lease. Alternatively, they claim (vii) breach of the Amended Option Agreement, (viii) breach of the Modified Operating Agreement, and they seek (ix) a declaratory judgment regarding the rights

---

[6] This case was designated a mandatory complex business case on 11 July 2019, (Designation Ord., ECF No. 1), and assigned to the Honorable Louis A. Bledsoe the same day, (Assignment Ord., ECF No. 2). The case was reassigned to the undersigned on 6 May 2020. (Reassignment Ord., ECF No. 98.)

of the parties as members of the LLC. RMP also asserts a third-party claim against LPI in the alternative for breach of fiduciary duty. (Countercls., ECF No. 9).

50. On 25 November 2019, Defendants filed a motion for judgment on the pleadings pursuant to North Carolina Rule of Civil Procedure ("Rule(s)") 12(c). (Defs.' Mot. J. Pleadings, ECF No. 22.) Judge Bledsoe denied the motion on 23 March 2020. See *Golden Triangle #3, LLC v. RMP-Mallard Pointe, LLC*, 2020 NCBC LEXIS 37, at *14 (N.C. Super. Ct. Mar. 23, 2020).

51. The parties filed the current Motions on 18 February 2021. (*See* ECF Nos. 60, 66.)

52. After full briefing, the Court held a hearing on the Motions on 29 July 2021 (the "Hearing"), at which all parties were represented by counsel. During the Hearing the Court ordered the parties to submit a joint stipulation of undisputed facts, which has now been filed. (ECF No. 107.) The Motions are now ripe for resolution.

### III.  LEGAL STANDARD

53. "Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.'" *Morrell v. Hardin Creek, Inc.*, 371 N.C. 672, 680 (2018) (quoting N.C. R. Civ. P. 56(e)). "[A] genuine issue is one which can be maintained by substantial evidence." *Kessing v. Nat'l Mortg. Corp.*, 278 N.C. 523, 534 (1971). "Substantial evidence is such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion and means more than a scintilla or a permissible inference." *Daughtridge v. Tanager Land, LLC*, 373 N.C. 182, 187 (2019) (citation and internal quotation marks omitted).

54. On a motion for summary judgment, "[t]he evidence must be considered 'in a light most favorable to the non-moving party.'" *McCutchen v. McCutchen*, 360 N.C. 280, 286 (2006) (quoting *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 470 (2004)). "[T]he party moving for summary judgment ultimately has the burden of establishing the lack of any triable issue of fact." *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491 (1985).

55. A movant may satisfy its burden by proving that "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of [the] claim[.]" *Dobson v. Harris*, 352 N.C. 77, 83 (2000) (citations omitted). "If the moving party satisfies its burden of proof, then the burden shifts to the non-moving party to 'set forth specific facts showing that there is a genuine issue for trial.'" *Lowe v. Bradford*, 305 N.C. 366, 369–70 (1982) (quoting N.C. R. Civ. P. 56(e)). If the nonmoving party does not satisfy its burden, then "summary judgment, if appropriate, shall be entered against [the nonmovant]." *United Cmty. Bank (Ga.) v. Wolfe*, 369 N.C. 555, 558 (2017) (quoting N.C. R. Civ. P. 56(e)).

## IV. ANALYSIS

56. Defendants move for summary judgment on each of Plaintiff's claims: (i) for breach of the Amended Option Agreement resulting from Defendants' alleged failure to execute the Modified Operating Agreement, make all required capital contributions to the LLC, and use best efforts to obtain financing, as well as for MCA's failure to honor Plaintiff's attempt to exercise the Levine Option, (*see* Compl. ¶¶ 33–34), and (ii) for a declaration that RMP failed to comply with its obligations under the Amended Option Agreement entitling Plaintiff to exercise the Levine Option or, alternatively a declaration that RMP is required to execute the Modified Operating Agreement and make the required contributions to the LLC.

57. Plaintiff moves for summary judgment on Defendants' counterclaims against it for (i) declaratory judgment that the Amended Option Agreement has been rescinded or that it is void due to impossibility or frustration of purpose, (ii) breach of the Ground Lease, (iii) a declaration of rights under the Ground Lease, or, alternatively, (iv) for breach of the Amended Option Agreement,[7] breach of the Modified Operating Agreement,[8] and a declaration regarding the rights of the parties as members of Carmel.[9]

---

[7] Plaintiff moves for partial summary judgment only as to ¶ 148(b)–(d) of Defendants' counterclaim for breach of the Amended Option Agreement.

[8] Plaintiff moves for partial summary judgment only as to ¶ 153(a)–(d) of Defendants' counterclaim for breach of the Modified Operating Agreement.

[9] Plaintiff moves for partial summary judgment only as to ¶ 162(b)–(c) of Defendants' counterclaim for declaratory judgment regarding rights of the LLC members.

58.     LPI moves for summary judgment on RMP's third-party claim against it for breach of fiduciary duty.

## A. Claims for Which Summary Judgment Is Precluded

59.     The parties collectively move for summary judgment on multiple claims asserted against one another in this litigation, all involving interpretation of (i) the Amended Option Agreement, (ii) the Modified Operating Agreement, and (iii) the Ground Lease.  The Court addresses the parties' overlapping arguments below.

### 1.     Claims Based on Breach of the Amended Option Agreement

60.     Several of the parties' claims depend on the Court's interpretation of the Amended Option Agreement and the parties' actions thereunder: (i) Plaintiff's claim for breach of the Amended Option Agreement and (ii) for a declaration that RMP failed to comply with its obligations under the Amended Option Agreement and that it is therefore entitled to exercise, and did properly exercise, the Levine Option, and (iii) Defendants' counterclaim in the alterative that the Amended Option Agreement was breached.

61.     Plaintiff alleges that Defendants breached the Amended Option Agreement by failing to make the required contributions to Carmel Providence; by RMP's failure to execute the Modified Operating Agreement or use "best efforts" to obtain project financing; and by MCA's failure to sell Plaintiff the Land pursuant to the Levine Option.  (Compl. ¶¶ 33–34.)

62.     Defendants counterclaim that Plaintiff breached the Amended Option Agreement by failing to use "best efforts" to obtain Project Financing, including by

refusing to agree to project financing that was seventy-five percent loan-to-value. (Countercls. ¶ 148(b)–(c).)

63. With respect to the parties' efforts to obtain Project Financing, material facts preclude summary judgment for either side. Key among the facts to be determined by a jury is the parties' intent with respect to use of the term "best efforts."

64. "Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution." *Lane v. Scarborough*, 284 N.C. 407, 409–10 (1973). "If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract." *Walton v. City of Raleigh*, 342 N.C. 879, 881 (1996).

65. However, "[a]n ambiguity exists where the language of a contract is fairly and reasonably susceptible to either of the constructions asserted by the parties. Stated differently, a contract is ambiguous when the writing leaves it uncertain as to what the agreement was[.]" *Salvaggio v. New Breed Transfer Corp.*, 150 N.C. App. 688, 690 (2002) (citations and internal quotation marks omitted). "An ambiguity exists in a contract if the language of a contract is fairly and reasonably susceptible to either of the constructions asserted by the parties." *Barrett Kays & Associates, P.A. v. Colonial Bldg Co., Inc. of Raleigh*, 129 N.C. App. 525, 528 (1998) (citations omitted). "The fact that a dispute has arisen as to the parties' interpretation of the contract is some indication that the language of the contract is, at best, ambiguous." *St. Paul Fire & Marine Ins. Co., v. Freeman-White Assocs., Inc.*, 322

N.C. 77, 83 (1988). Whether the contract is ambiguous is a question for the court to determine. *Lynn v. Lynn,* 202 N.C. App. 423, 432 (2010).

66. Extrinsic evidence may be consulted when the language of a contract is ambiguous. *See e.g.,* *Inland Am. Winston Hotels, Inc. v. Crockett*, 212 N.C. App. 349, 354 (2011). "If the writing leaves it uncertain as to what the agreement was, parol evidence is competent, not to contradict, but to show and make certain what was the real agreement between the parties." *Int'l Paper Co. v. Corporex Constructors, Inc.*, 96 N.C. App. 312, 317 (1989). However, in that event, interpretation of the contract is a question of fact for the jury. *Id.*; *see also Schenkel & Schultz, Inc. v. Hermon F. Fox & Assocs., P.C.,* 362 N.C. 269, 273 (2008); *Whirlpool Corp. v. Dailey Constr., Inc.* 110 N.C. App. 468, 471 (1993); *Martin v. Ray Lackey Enterprises, Inc.*, 100 N.C. App. 349, 354 (1990) ("[I]ntent is a question of law where the writing is free of any ambiguity which would require resort to extrinsic evidence or the consideration of disputed fact."); *Cleland v. Children's Home, Inc.*, 64 N.C. App. 153, 57 (1983) (ambiguities in contracts are to be resolved by the jury).

67. Here, the language of the contract is not clear on its face. Nowhere in the contract do the parties define "best efforts," and " '[b]est efforts' has been widely held to be an ambiguous contract term." *Martin v. Monumental Life Ins. Co.*, 240 F.3d 223, 233 (2001) (citing *U.S. Airways Group, Inc. v. British Airways PLC*, 989 F.Supp. 482, 491 (S.D.N.Y.1997); *Grant v. Board of Educ.*, 282 Ill.App.3d 1011, 218 Ill.Dec. 356, 668 N.E.2d 1188 (Ill.App.1996)); *see also Pinnacle Books, Inc. v. Harlequin Enters., Ltd.,* 519 F. Supp. 118, 121 (S.D.N.Y. 1981) ("Essential to the

enforcement of a 'best efforts' clause is a clear set of guidelines against which the parties' 'best efforts' may be measured."). Instead, they argue that the other side's refusal to agree to their chosen lender—when the terms of each loan differ—constitutes a violation of the "best efforts" clause. But "[t]he requirement that a party use its best efforts necessarily does not prevent the party from giving reasonable consideration to its own interests." *Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609, 614 (2d Cir. 1979).

68. In addition, factors such as a party's expertise and experience should be considered to determine whether the party used best efforts, facts that are not established in this record. *See Triple-A Baseball Club Assoc. v. Ne. Baseball, Inc.*, 655 F. Supp. 513, 540 (D. Me. 1987); *Carlson Brewing Co. v. Salt Lake Brewing Co.*, 95 P.3d 1171, 1179 (Utah Ct. App. 2004). Therefore, the Court concludes that genuine issues of material fact exist precluding summary judgment for either side with respect to claims involving an interpretation of the "best efforts" term in the Amended Option Agreement.

69. Assuming that interpreting "best efforts" requires an evaluation of each party's objections to the BB&T and Wells Fargo loan terms raises even more issues of material fact regarding the contract language that a jury will have to resolve. For example, the Court cannot determine as a matter of law whether the seventy-five percent loan-to-value requirement applies only to permanent financing, as Plaintiff argues, or also to construction financing, as Defendants argue. The clause reads: "[T]he LLC will use its best efforts to obtain either construction financing (if the C-

Store Parcel and Land are rezoned and a new retail development is pursued) or permanent financing (if the Apartments are renovated) *with a loan-to-value of not less than seventy-five percent (75%).*" (Am. Option Agr., at § 1(d) (emphasis added).) There is no comma before the italicized prepositional phrase, and it is not clear whether the phrase modifies one or both types of financing.

70.     Plaintiff offers Levine's testimony in support of its conclusion that the seventy-five percent loan-to-value qualifier applies only to permanent financing for apartment renovation—a path not pursued after the successful rezoning.  In Levine's experience, construction financing, which is what the parties were seeking for the new development, is based on a loan-to-*cost* ratio.  (Levine Dep. 56:17–19, ECF 67.3 ("Typically, in construction loans, in construction financing, it's based on a loan-to-cost ratio.").)  Thus, Plaintiff argues that the Amended Option Agreement's seventy-five percent loan-to-*value* requirement could only have applied to permanent financing and that no such requirement applied to Project Financing.  (Pl.'s Br. 25.) Defendants disagree and argue that Levine took a different position when he came to the belief that the financial market at that time "would simply not allow [75% LTV permanent financing]."  (Defs.' Br. Opp'n 23; Levine Dep. 268:10–14.)

71.     Unfortunately, the presence or absence of a comma alone does not decide the issue here.  Only after the sense of the contract has been gathered from its words may punctuation assist with its construction.  *Huffman v. Occidential Life Ins. Co.*, 264 N.C. 335, 337–38 (1965). *Cf. Stephens Co. v. Lisk*, 240 N.C. 289, 293 (1954) (punctuation properly used may support the interpretation process if the parties'

intent is otherwise clear from the plain words of the contract); *CB & H Bus. Servs., L.L.C. v. J.T. Comer Consulting, Inc.*, 184 N.C. App. 720, 722 (2007) ("[P]unctuation or the absence of punctuation in a contract is ineffectual to control its construction as against the plain meaning of the language.") Consequently, because the language is ambiguous, it will be up to a jury to evaluate extraneous evidence of industry practice and market conditions to determine the intent of the parties.

72. Plaintiff also alleges that RMP breached the Amended Option Agreement by failing to sign the Modified Operating Agreement or contributing the Land to Carmel. The Amended Option Agreement states that upon successful rezoning, "the Parties promptly (and not later than thirty (30) days after the successful Rezoning . . .) shall cause Articles of Organization for the LLC to be filed with the office of the Secretary of State of North Carolina, and both Parties shall sign the Operating Agreement attached hereto . . ., [and] make contributions of the C-Store Parcel . . ., Land and Property . . ., and other capital to the LLC[.]" However, it also says: "Notwithstanding anything contained in this Agreement, the parties hereto agree that the capitalization of the LLC as set forth in [this paragraph] shall not occur until the closing of the Project Financing[.]" (Am. Option Agr., at § 1(d).)

73. RMP argues that he did not sign or make the required contributions because it was not required to do so until the closing of Project Financing pursuant to Section 1(d). Plaintiff responds that the parties could not close on Project Financing because of RMP's failure to sign the Modified Operating Agreement and failure to agree to the Wells Fargo deal.

74. That brings the parties to the horns of a dilemma: they each argue that, for different reasons, the Amended Option Agreement's requirements were not met because Project Financing did not close, and Project Financing could not close because requirements under the Amended Option Agreement were not met. Resolution of this Gordian knot depends on disputed material facts. Summary judgment, therefore, is not proper. *See, e.g., Sports Quest, Inc. v. Dale Earnhardt, Inc.*, 2004 NCBC LEXIS 9, at *35 (N.C. Super. Ct. Feb 12, 2004) ("The Court is not a finder of fact and cannot act as a jury in the summary judgment phase.").

75. In the same vein, the Court concludes that summary judgment on Defendants' claim for a declaration that the parties have mutually agreed to rescind the Amended Option Agreement is inappropriate. An "agreement to rescind need not be expressed in words. Mutual assent to abandon a contract . . . may be manifested in other ways than by words." *Glen Wilde, LLC v. Fletcher*, No. COA14-1171, 2015 N.C. App. LEXIS 298, at *4 (N.C. Ct. App. 2015) (citation omitted). However, "such evidence must be positive, unequivocal, and inconsistent with the contract." *Lancaster v. Lumby Corp.*, 77 N.C. App. 644, 646 (1985). Furthermore, "[r]escission depends not only upon the acts of the parties, but it also depends upon the intent with which they are done." *Top Line Constr. Co. v. J.W. Cook & Sons*, 118 N.C. App. 429, 433 (1995).

76. Questions of intent are quintessentially issues for the jury. *See, e.g.*, *Citrini v. Goodwin*, 68 N.C. App. 391, 395 (1984) ("[O]n conflicting evidence of intent, the jury must resolve the issue.") While Defendants argue that Plaintiff's statement

through Levine that "[n]otwithstanding both of us working in good faith to make it work, our differences are such that neither can agree on a mutually agreeable path forward" is an indisputable indication of Plaintiff's intent to rescind the Amended Option Agreement, Plaintiff sees it differently. (Nov. 15, 2018 Email.) According to Levine, the statement was made in the context of negotiations between the parties with respect to their dispute over Project Financing and was never intended as a statement that Plaintiff had "thrown in the towel." In short, the evidence with respect to rescission in this case is far from certain. Summary judgment is therefore inappropriate. *See Cleland*, 64 N.C. App. at 156 (1983) ("[Where] a genuine issue of material fact exists in regard to the intention of the parties, summary judgment [is] not appropriate.").

77. Finally, Plaintiff asserts that MCA breached the Amended Option Agreement by refusing to sell Plaintiff the Land pursuant to the Levine Option. MCA responds that Plaintiff's late-in-the-day demand for RMP to execute the Modified Operating Agreement after failing to do so itself over the course of about six years was nothing more than a pretext so that Plaintiff could attempt to trigger the Levine Option. The Court has visited this issue once before at the pleadings stage. *See Golden Triangle #3, LLC*, 2020 NCBC LEXIS 37, at *12 (concluding that Section 1(e) of the Amended Option Agreement, providing for contribution of the Land upon RMP's failure to "comply with its obligation to form and contribute capital to the LLC" is "capable of more than one reasonable interpretation and thus is ambiguous"). Since

then, the parties' disputes over the facts have not resolved but rather appear to have proliferated. Accordingly, the issue remains one to be decided by a jury.

78. Therefore, summary judgment is DENIED as to each party's claim that the other breached the Amended Option Agreement with respect to their efforts to secure Project Financing; for a declaratory judgment with respect to RMP's failure to sign the Modified Operating Agreement or contribute the Land to the LLC, and for a declaratory judgment with respect to MCA's failure to sell the Land to Plaintiff; and for recission of the Amended Option Agreement.

## 2. Claims Based on Breach of the Modified Operating Agreement

79. The parties' claims that depend upon the Court's interpretation of the Modified Operating Agreement include Defendants' counterclaims in the alternative for (i) breach of the Modified Operating Agreement and (ii) for declaratory judgment regarding the rights of the parties as members of the LLC, as well as (iii) RMP's third-party claim against LPI in the alternative for breach of fiduciary duty under the Modified Operating Agreement.

80. Instead of "best efforts," the Modified Operating Agreement uses the term "good faith, diligent efforts" when describing the obligation of the LLC's members and its manager to close on Project Financing. In addition, the loan must be approved by the LLC's members, Golden Triangle and RMP. (*See* Mod. Operating Agr., at § 5.1(a).)

81.     Defendants allege that Plaintiff failed to use diligent, good faith efforts to obtain financing by (1) failing to provide complete financial documentation to all potential lenders (*i.e.* BB&T); (2) refusing to negotiate about the scope of the Project; (3) refusing to consider lending options such as a mezzanine loan; (4) refusing to agree to financing that included joint and several guaranties; (5) objecting to RMP's proposed assignment to Morgan; and (6) demolishing the apartments and paying off its debt, "thereby rendering it impossible for Plaintiff to ever comply with the terms of the Operating Agreement[.]" (Countercls. ¶ 153.) Similarly, Defendants' claim for declaratory judgment regarding the parties' rights as members of the LLC asks for declarations that (i) the Wells Fargo loan did not comply with the Modified Operating Agreement, including its requirement for several guaranties; and (ii) the parties' obligation to use "best efforts"[10] required them to make use of additional lending options such as a mezzanine loan and/or to limit the scope of the project. (Countercls. ¶ 162.)[11]

82.     RMP's third-party claim against LPI alleges that LPI breached its fiduciary duty owed to RMP by, among other things, causing predevelopment expenses to be incurred improperly; failing to use its "best efforts" to obtain compliant financing; advocating for joint rather than several guaranties; objecting to RMP's

---

[10] Although the Modified Operating Agreement uses the phrase "diligent, good faith efforts," the parties sometimes interchange this phrase with the Amended Option Agreement's requirement of "best efforts."

[11] Defendants also allege that Plaintiff breached the Modified Operating Agreement by incurring predevelopment expenses in its own name, and it requests a declaration that Plaintiff may not include these costs in its capital account. However, Plaintiff's motion does not address these claims, so the Court does not address them.

proposed assignment to Morgan; proposing a revised operating agreement to the benefit of Golden Triangle and the detriment of RMP; and, generally, "putting the personal preferences of [Golden Triangle] over those of RMP, the requirements of the Operating Agreement, and the best interests of the LLC." (Countercls. ¶ 159.)

83. Like the "best efforts" term in the Amended Option Agreement, use of the undefined term, "diligent, good faith efforts" in the Modified Operating Agreement creates an ambiguity that precludes summary judgment on many of these claims. In short, whether Plaintiff's conduct satisfied this standard when it disagreed with Defendants regarding terms of Project Financing, as well as when it engaged in its own efforts to secure that financing, is a question of fact for a jury.

84. For example, the Modified Operating Agreement does not mandate several guaranties. Instead, it says, "Any construction loan guaranties shall be several *to the extent that the lender will agree* to a several guaranty or if the lender will not agree to several guaranties, the construction loan guaranties shall be joint and several to the RMP principals and the Levine principals." (Mod. Operating Agr., at Ex. E.) Therefore, while several guaranties were preferable, they were not required, and it is unclear on this record whether Levine attempted to secure several guaranties. If he did, and if Wells Fargo did not agree to that term, a jury could conclude that it was not a breach of "diligent, good faith efforts" on Levine's part to forego several guaranties when faced with the potential to secure financing at a lower interest rate and with lesser fees than were offered by BB&T. On the other hand, reasonable minds could also conclude that Levine did not make a sufficient effort to

locate another lender that would provide several guaranties in addition to acceptable rates and fees.[12]

85. Additionally, the Modified Operating Agreement expressly permits a member to transfer its interest, in whole or in part, to an "Affiliate," a defined term.[13] But RMP's proposed Affiliate, Morgan, did not agree to be a guarantor. According to Levine, the affiliation was objectionable because the language of the Modified Operating Agreement ("Levine and RMP, or affiliates thereof, shall provide all guaranties and indemnities relating to any recourse Loan") applied to affiliates of *both* RMP and Morgan, such that any affiliate would be required to guarantee the loan used for Project Financing. Conversely, RMP believes use of the lower case "a" for "affiliate" in the guaranty provision means that Morgan, which was to be a capital "A" "Affiliate" as defined by Section 9.2 of the Modified Operating Agreement, was not required to guarantee the loan. In addition, RMP argues that the disjunctive "or"

---

[12] Defendants claim that Levine breached the Modified Operating Agreement by not providing BB&T with all of the requested financial information necessary to progress its proposed loan. However, it is undisputed that Levine did not like the terms of that loan and did not intend to approve it. At the Hearing, it was also suggested that even had Levine provided the requested information, the terms of the BB&T loan would not have changed. (*See, e.g.*, Tr. 83:19–25 (Counsel for Plaintiff: "Mr. Miller writes Mr. Levine, . . . and said, I just got off the phone with [BB&T]. [It] informed me that the bank would not be able to increase the loan dollars or reduce the rate. . . [T]hey weren't willing to give Mr. Miller what he requested.").) Consequently, on this record, it does not appear that Levine's decision not to provide BB&T the additional financial information it requested was a material breach of the Modified Operating Agreement. At the same time, the mere fact that BB&T's proposed loan stopped at the term sheet stage and Wells Fargo's proposed loan progressed to a commitment is also not dispositive of whether the parties satisfied the "diligent, good faith efforts" standard.

[13] The term is defined in relevant part as "[a]ny entity or individual that directly or indirectly controls or holds the power to vote 10% or more of the outstanding voting securities of the Person in question." (Mod. Operating Agr., at § 1.3.)

in the relevant phrase of the Modified Operating Agreement means that it could opt to sign the guaranty without Morgan, regardless of the size of its interest in the LLC.

86.     A defined term in a contract must be interpreted in accordance with its definition. *State v. Philip Morris USA Inc.*, 363 NC 623, 632 (2009). However, it is not clear from the language the parties used whether they intended to require that an Affiliate (upper case "A") guarantee a loan. Nor is it clear whether an affiliate must guarantee a loan for its principal if the principal itself is guaranteeing the loan. Once again, the parties have stalemated over the words of their agreement. A jury will have to sort it out. Accordingly, both Plaintiff and Defendants' Motions are DENIED.

87.     With respect to LPI's Motion for summary judgment in its favor as to RMP's claim for breach of fiduciary duty against it as manager of Carmel, the parties' express agreement that LPI owed "a fiduciary duty and a duty of loyalty to the Members and the Company[,]" (Mod. Operating Agr., at § 6.2(a)), establishes a manager-member fiduciary duty. However, given that the claim against LPI turns on the same fact determinations that need to be made with respect to the language of the Modified Operating Agreement as discussed above, LPI's Motion with respect to that claim is also DENIED.

88.     This leaves Plaintiff's motion for summary judgment with respect to Defendants' counterclaim that Plaintiff breached Section 5.1 of the Modified Operating Agreement by demolishing the apartments and paying off the KeyBank loan, all before the parties closed on Project Financing. Because the facts with respect

to this claim overlap with those pertaining to Defendants' claim for breach of the Ground Lease, it is addressed below.

### 3. Claims Based on Breach of the Ground Lease

89. Two of Defendants' counterclaims depend on the interpretation of the Ground Lease: the claims for (i) breach of the Ground Lease, and (ii) declaratory judgment regarding the parties' rights thereunder.

90. MCA alleges that Plaintiff breached the Ground Lease by demolishing the apartments and by failing to pay all rent due under it. It asks for damages in unpaid rent and for the present value of the reversionary interest, as well as a declaration that MCA is entitled either to terminate the Ground Lease or to receive the fair rental value of the Land going forward.

91. Plaintiff argues that the Amended Option Agreement incorporated the Ground Lease and that demolition was a "necessary step" for redevelopment of the property. (Pl.'s Br. 20.) MCA counters that incorporation of the Ground Lease did not alter its terms, which expressly required Plaintiff to keep the Property "in good condition and repair" and to "not commit waste thereon." (Ground Lease, at §§ 9.3, 14). Defendants further contend that given that closing on agreed Project financing had not occurred, Plaintiff's unilateral decision to demolish the apartments was premature.

92. But Plaintiff points to conduct on the part of Defendants that it contends is evidence of Defendants' approval of its actions. It argues that although Miller was well-aware of the plan for demolition, he did nothing to indicate that he objected to

it. In fact, Plaintiff says, Miller supported the decision to move forward. Specifically, Plaintiff points to an email Miller sent to the C-store parcel tenant on 23 December 2015, stating in part, "We are planning to commence the demolition and redevelopment of the Carmel on Providence apartments adjacent to your store around June or July 2016." (Dec. 23, 2015 Email, ECF No. 67.4.) On 26 April 2016, Miller wrote to an attorney regarding a tree ordinance, again referencing plans for the demolition, "We will need to begin demolition soon since the property is becoming very vacant." (Apr. 26, 2016 Email, ECF No. 67.4.)

93. Demolition took place from approximately May through November 2017. (*See* Emails, ECF No. 67.4.) On 12 July 2017, Miller emailed a representative of Novant, stating, "We are currently underway with the demolition of the apartment buildings. We expect completion of the demolition by November 3, 2017. . . . I believe we have taken reasonable steps to keep the project moving forward[.]" (July 12, 2017 Email, ECF No. 67.4.)

94. Miller responds by pointing to his email to Levine and other representatives of LPI on 24 October 2015, admonishing them to "delay sending non-renewal notices to the tenants" until they got a better handle on various "items," including Project Financing. (Oct. 24, 2015 Email, ECF No. 83.8.) Even so, Miller testified that he "may have" consented to the filing of a permit [for demolition]. (Miller Dep. 39:10–11, ECF No. 67.2.) He remembered "seeing some correspondence . . . saying that they were getting ready to demolish the apartments . . . [in] [l]ate '16, early '17" and admitted, "I did not respond." (Miller

Dep. 49:13–50:14.) Miller explains that he thought that once the apartments were vacant, vandalism and vagrants would cause damage, so he did not express objection to the planned demolition. (Miller Dep. 50:15–21.) And he remembers giving one of his partners permission to go on-site and get some pavers from the demolition rubble. (Miller Dep. 226:6-9)

95. Miller's colleague testified that he does not remember Miller being surprised by the demolition and, particularly given the fact that the apartments were obviously vacant, he was not surprised by it. (Orndorff Dep. 34:5–36:4, ECF No. 67.7.) Miller himself testified that he was not surprised by the demolition because he "probably knew it was coming[.]" (Miller Dep. 225:19.)

96. Finally, Miller was also advancing the ball with respect to the Project by negotiating leases with anchor tenants. (Levine Dep. 217:7–218:25).

97. Given this evidence, and despite the language of the Ground Lease giving Defendants a reversionary interest in the apartments, as well as the language of the Amended Option Agreement specifying that the apartments were to be contributed to the LLC when Project Financing closed, summary judgment is inappropriate.[14] A jury could conclude that Defendants agreed (or, at least, waived objection[15]) to a faster timeline for demolition (and, concomitantly, payment of the KeyBank loan) in an effort to be "a good partner," (Tr. at 23:19), or because

---

[14] Summary judgment is also inappropriate with respect to Defendants' similar claim that these actions violation Section 5.1 of the Modified Operating Agreement.

[15] The Court notes that Section 12.1 of the Modified Operating Agreements requires a waiver of its provisions to be in writing. It is not apparent in this record whether such a writing exists.

Defendants were motivated to move the project along in order to accommodate the timing of the would-be tenants with which Miller had been negotiating.

98. Lastly, Plaintiff contends that it did not violate the Ground Lease because it has paid all rent it calculated to be due when it was due. Moreover, Plaintiff argues, if any breach has occurred, Defendants' acceptance of the rent payments constitutes a waiver of the claim. (Pl.'s Br. 22–23). Defendants deny that acceptance of partial payment constitutes waiver and point to the notice of default MCA provided to Plaintiff. (*See* Dec. 19, 2018 Email.) Furthermore, according to Defendants, Plaintiff has left the premises unrentable to third parties, entitling Defendants to the Property's fair rental value as of the time of Plaintiff's default. (Defs. Br. Opp'n 13 (citing N.C.P.I. Civil 503.48).)

99. If Plaintiff is determined to have breached the Ground Lease, MCA is entitled to recover all unpaid rent owed to it. MCA's retention of the allegedly insufficient amount paid by Plaintiff since the demolition does not waive this right. Nevertheless, having accepted those payments, MCA is no longer entitled to terminate the lease. *See Price v. Conley*, 12 N.C. App. 636, 640 (1971).

100. Whether and how the demolition affects the rent calculation for the Property depends on facts still to be determined. For example, if a jury concludes that MCA, through Miller, despite the terms of the Ground Lease, acquiesced in Plaintiff's decision to demolish the apartments, the calculation will be different than if the facts prove otherwise.

101.    Therefore, Plaintiff's Motion is DENIED as to each of Defendants' counterclaims regarding the Ground Lease.

102.    Fundamentally, then, summary judgment cannot be granted with respect to a majority of the claims presented by the Motions because material facts are in dispute.   Rule 56 is clear that when this happens, the Court may not weigh the evidence, but must deny summary judgment so that the facts may be determined by a jury.  *See, e.g., Volkman v. DP Assocs.*, 48 N.C. App. 155, 157 (1980)); *In re Will of Jones*, 362 N.C. 569, 573 (2008). ("[I]f there is any question as to the weight of evidence summary judgment should be denied.").

## B. <u>Claims for Which Summary Judgment Is Appropriate</u>

103.    Notwithstanding the many facts that remain to be determined in this case, the record does provide a sufficient basis to address Plaintiff's Motion for Partial Summary Judgment with respect to Defendants' counterclaims that the Amended Option Agreement is void either because performance is impossible or because the expected value of performance has been frustrated.

104.    Defendants allege that the Amended Option Agreement requires Plaintiff to contribute the Property (the apartments and the leasehold interest) to the LLC.  Therefore, Plaintiff's decision to demolish the apartments makes performance of the Amended Option Agreement impossible and voids the contract.  (Countercls. ¶¶ 128–30.)  As discussed more fully above, Plaintiff responds that the parties agreed to demolish the apartments as part of the Project and that they both took concrete steps to effectuate their agreement.

105.    The defense of impossibility allows a party that is without fault to avoid liability for its breach based on an unavoidable event which has rendered performance either impossible or impracticable.  *See, e.g.*, Restatement (Second) of Contracts § 263 (stating that when the "destruction or deterioration [of a specific thing necessary for performance] makes performance impracticable, the obligor's duty to render that performance is discharged").

106.    "Impossibility of performance is recognized in this jurisdiction as excusing a party from performing under an executory contract if the subject matter of the contract is destroyed without fault of the party seeking to be excused from performance."  *Brenner v. Little Red School House, Ltd.*, 302 N.C. 207, 211 (1981). "[T]he defense is available only when there was an unanticipated or unforeseeable circumstance that made performance impossible or impracticable."  Am. Jur. 2d Contracts § 646; *see also Messer v. Laurel Hill Assocs.*, 102 N.C. App. 307, 312 (1990) ("[W]here the event which causes the impossibility was or might have been anticipated and guarded against in the contract, an unqualified undertaking is to be construed as an absolute contract binding the promisor to perform things which subsequently become impossible or to pay damages for the nonperformance[.]" (citation omitted)).[16]

---

[16] A classic example of the application of the defense of impossibility is when a laborer who has contracted to perform a service on a house, such as shingling its roof, is excused from performing when the roof of the house, through no fault of the laborer, is destroyed by an unforeseen fire. *See* Restatement (Second) of Contracts § 263 illus. 3. The example involves a circumstance that was both unforeseeable and for which the laborer was not at fault.

107. Here, the undisputed facts establish that, at the time of contract formation, the parties contemplated that the apartments would be demolished if they obtained rezoning approval. The problem here is that Plaintiff allegedly jumped the gun and demolished the apartments before financing for the new Project had been secured. Therefore, Defendants' excuse for not performing is not impossibility, but rather Plaintiff's alleged antecedent material breach. Therefore, Plaintiff's Motion with respect to Defendants' second claim for relief will be GRANTED.

108. Similarly, Defendants allege that the Parties obtained zoning that "allowed for more significant development than the Parties anticipated at the time of their Agreement[,]" resulting in a higher cost for the Project that "made it impossible for the Parties to reach an agreement on Project Financing." (Countercls. ¶ 133.) And, given that agreement on Project Financing was a threshold requirement for proceeding with the Project, Defendants contend, ironically, that the parties' unforeseeable success with respect to rezoning resulted in "a practically total destruction of the expected value of the Agreement." (Countercls. ¶ 133.) On this basis they allege that the doctrine of frustration of purpose operates to void the Amended Option Agreement.

109. Frustration of purpose excuses a party's breach when the parties' mutual expectation of value under a contract is destroyed. *See* Restatement (Second) of Contracts § 265 (stating that the doctrine "deals with the problem that arises when a change in circumstances makes one party's performance virtually worthless to the other, frustrating his purpose in making the contract").

110. Frustration of purpose "is similar to, but distinct from, the doctrine of impossibility[.]" *WRI/Raleigh, L.P. v. Shaikh*, 183 N.C. App. 249, 254 (2007). Our Supreme Court has articulated this distinction:

> Although the doctrines of frustration and impossibility are akin, frustration is not a form of impossibility of performance. It more properly relates to the consideration for performance. Under it performance remains possible, but is excused whenever a fortuitous event supervenes to cause a failure of the consideration or a practically total destruction of the expected value of the performance. The doctrine of commercial frustration is based upon the fundamental premise of giving relief in a situation where *the parties could not reasonably have protected themselves by the terms of the contract against contingencies which later arose.*

*Brenner*, 302 N.C. 207 at 211 (1981) (emphasis added) (quoting 17 Am. Jur. 2d Contracts § 401)).

111. "[E]ssentially, there must be an implied condition in the contract that a changed condition would excuse performance; this changed condition causes a failure of consideration or the expected value of performance; and that the changed condition was not reasonably foreseeable." *Faulconer v. Wysong & Miles Co.*, 155 N.C. App. 598, 602 (2002).

112. In this case, the parties' successful rezoning efforts were anything but fortuitous. They jointly submitted the Site Plan, as well as the SPA, and advocated for its success. The parties furthermore had every opportunity to protect their interests via contract but failed to do so. The fact that they later could not agree either on the financing they would need to take advantage of the full extent of their successful rezoning, or on a way to narrow the scope of the Project, is unfortunate but not unforeseeable. *Paez v. Paez,* No. COA18-1206, 2020 N.C. App. LEXIS 85, at *8

(N.C. Ct. App. 2020) ("The guiding principle underlying the frustration of purpose doctrine is to 'give relief in a situation where the parties could not reasonably have protected themselves by the terms of the contract against contingencies which later arose.' " (quoting *Currituck Assocs. - Residential P'ship v. Hollowell,* 166 N.C. App. 17, 29 (2004)); *see also WRI/Raleigh, L.P.*, 183 N.C. App. at 254 ("[T]he doctrine of frustration cannot be used where the frustrating event was reasonably foreseeable." (citing *Brenner*, 302 N.C. at 211)). Consequently, frustration of purpose is not available as a defense on these facts. Accordingly, Plaintiff's Motion as to Defendants' claim that the Amended Option Agreement is void pursuant to the doctrine of frustration of purpose shall be GRANTED.

## V.     CONCLUSION

113.   WHEREFORE, the Court hereby ORDERS as follows:

a. Plaintiff's Motion for Partial Summary Judgment on Defendants' counterclaims for declarations that the Amended Option Agreement is void due to impossibility or frustration of purpose is GRANTED, and Defendants' second and third counterclaims are hereby DISMISSED with prejudice;

b. Plaintiff's Motion for Partial Summary Judgment as to Defendants' remaining claims is DENIED, and all remaining claims shall proceed to trial;

c. Defendants' Motion for Summary Judgment as to Plaintiff's claims is DENIED, and those claims shall proceed to trial; and

d. LPI's Motion as to RMP's third-party claim against it for breach of fiduciary duty is DENIED, and that claim shall proceed to trial.[17]

IT IS SO ORDERED, this the 2nd day of August, 2022.

/s/ Julianna Theall Earp

Julianna Theall Earp
Special Superior Court Judge
 for Complex Business Cases

---

[17] The Court will confer with counsel for the parties and will set a trial date, as well as a schedule for pretrial submissions, by separate order.